Granovsky & Sundaresh PLLC
Benjamin Rudolph Delson (BD-1724)
Alexander Granovsky (AG-6962)
48 Wall Street / New York, NY 10005
delson@g-s-law.com / ag@g-s-law.com
(646) 524-6001
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TIFFANY ADLER, | No. _____ |
| *Plaintiff,* | |
| v. | **COMPLAINT and JURY DEMAND** |
| SONOTEC US INC., SONOTEC GMBH, and CHRISTOPHER PORTELLI, | |
| *Defendants.* | |

Plaintiff Tiffany Adler, through her attorneys, Granovsky & Sundaresh PLLC, and as her complaint against Defendants Sonotec US Inc., Sonotec GmbH and Christopher Portelli, alleges as follows:

## NATURE OF ACTION

1.     In July 2022 Defendant Christopher Portelli hired Plaintiff Tiffany Adler to serve first as an Administrative Assistant and then as a Project Manager for Defendants Sonotec US Inc. and Sonotec GmbH.

2.     Mr. Portelli began to sexually harass Ms. Adler immediately after he hired her. The specifics, which are detailed below, are both disgraceful and disgusting.

3.     Ms. Adler simply wanted a good job.  She put up with Mr. Portelli's constant sexual advances month after month—until finally she began to search for a lawyer.

4.     In early January 2023, when Mr. Portelli finally accepted that Ms. Adler would never consent to his appeals for sexual affection and when he learned that she was searching for legal counsel to bring claims for sexual harassment, he fired Ms. Adler.

5.     Mr. Portelli's behavior caused acute psychological distress to Ms. Adler, as detailed below.  And, when she stood up for herself and sought help, she suffered the loss of her job.

6.     Through this lawsuit, Ms. Adler seeks to be made whole.  She asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*. ("Title VII"), New York State Human Rights Law, New York Exec. Law § 296 *et seq*. ("NYSHRL"), and New York common law.

## JURISDICTION, VENUE AND TIMELINESS

7.     This Court has subject matter jurisdiction over Plaintiff's claims under Title VII pursuant to 28 U.S.C. §§ 1331.

8.     This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims herein occurred in this District.

10.     Within 300 days of the events described below, on February 14, 2023, Ms. Adler through counsel timely filed a Charge of Discrimination with the EEOC.  The EEOC

issued Ms. Adler a Right to Sue Letter on February 17, 2023.   Within 90 days, Ms. Adler, through counsel, timely filed this lawsuit.

**PARTIES**

**Plaintiff**

11.    Plaintiff Tiffany Adler is a twenty-six year-old woman and a resident of New York.

12.    From approximately July 2022 to January 2023, Ms. Adler was employed by Defendants Sonotec US Inc. and Sonotec GmbH.   Her immediate supervisor was Defendant Christopher Portelli, who was the Managing Director of Sonotec US Inc.

**Defendants**

13.    Defendant Sonotec US Inc. is a Delaware corporation with headquarters in Islandia, New York.

14.    Sonotec US Inc. has four Directors: Hans Münch, Michael Münch, Manuela Münch, and Defendant Christopher Portelli.

15.    Upon information and belief, Hans Münch, Michael Münch and Manuela Münch are members of the same family and are residents of Germany.   Upon information and belief, the Münch family (either directly or indirectly) owns a controlling share of Sonotec US Inc.

16.    Defendant Christopher Portelli is the Managing Director of Sonotec US Inc.

17.     Upon information and belief, while the Münch family delegate to Mr. Portelli most responsibility for the day-to-day operations of Sonotec US Inc., they exercise ultimate control over Sonotec US Inc. and Mr. Portelli.

18.    Upon information and belief, including statements made by Managing Director Christopher Portelli to Plaintiff Tiffany Adler in December 2022, Sonotec US Inc. has seventeen employees located in the United States.

19.    Defendant Sonotec GmbH is a German corporation.

20.    Upon information and belief, Sonotec GmbH has in excess of 190 employees worldwide.

21.    Upon information and belief, Hans Münch is a co-founder of Sonotec GmbH.

22.    Upon information and belief, Hans Münch, Michael Münch and Manuela Münch manage most or all operations of Sonotec GmbH and together own a controlling share of Sonotec GmbH.

23.    In January 2023, the websites for Sonotec GmbH and Sonotec US Inc. were formatted with identical design and contain largely identical content.

24.    For example, in January 2023, the "About Us" portion of the website for Sonotec GmbH, www.sonotec.eu, stated: "SONOTEC was founded in the beginning of 1991 by the physicists Dr. Santer zur Horst-Meyer and Hans-Joachim Münch and has been owner-managed since then. Since 2013 SONOTEC has established a subsidiary in a [sic] sales and service based in Islandia, NY. SONOTEC US is a proud supplier to equipment manufacturers and vaccine manufacturers for project Warp Speed. Since April 2019, Manuela and Michael Münch strengthen the management team of the German family business, Dr. Santer zur Horst-Meyer will still be available as an advisor. With currently more than 190 employees, today we are a

growing technology company established on the market as a provider of products and solutions using ultrasonic measurement technologies."

25.     In January 2023, the "About Us" portion of the website for Sonotec GmbH featured a color photograph of Hans, Michael and Manuel Münch.

26.     In comparison, in January 2023, the "About Us" portion of the website for Sonotec US Inc., www.sonotecusa.com, contained identical or nearly identical language:  "SONOTEC was founded in the beginning of 1991 by the physicists Dr. Santer zur Horst-Meyer and Hans-Joachim Münch and has been owner-managed since then. Since 2013 SONOTEC has established a subsidiary in a sales and service [sic] based in Islandia, NY. SONOTEC US is a proud supplier to equipment manufacturers and vaccine manufacturers for project Warp Speed. Since April 2019, Manuela and Michael Münch strengthen the management team of the German family business, Dr. Santer zur Horst-Meyer will still be available as an advisor. With currently more than 190 employees, today we are a growing technology company established on the market as a provider of products and solutions using ultrasonic measurement technologies."

27.     In January 2023, the "About Us" portion of the website for Sonotec US Inc. featured a color photograph of Hans, Michael and Manuel Münch and Christopher Portelli.

28.     Defendant Sonotec GmhB and Defendant Sonotec US Inc. are part of a single, integrated enterprise, with Sonotec US Inc. operating as the U.S.-based subsidiary of the parent company, Sonotec GmbH.

29.     Sonotec GmbH and Sonotec US Inc. operate under common ownership.  Upon information and belief, either Sonotec US Inc. is ultimately owned and controlled by Sonotec GmbH, or Sonotec US Inc. and Sonotec GmbH are both ultimately owned and controlled by the same individuals, including the Münch family.

30.     Sonotec GmbH and Sonotec US Inc. operate under common management. Upon information and belief, the Münch family exercises ultimate managerial control over both entities.

31.     Sonotec GmbH and Sonotec US Inc. do not operate at arm's length:

      a.  Sonotec US Inc.'s only revenue comes from the sale of products manufactured by Sonotec GmbH.

      b.  Upon information and belief, Sonotec US Inc. does not have any meaningful or independent ability to negotiate the prices at which it acquires goods for sale from Sonotec GmbH.

      c.  Sonotec US Inc. is Sonotec GmbH's sole distributor of goods in the United States.

      d.  Upon information and belief, Sonotec US Inc.'s net profits (or losses) accrue directly or indirectly to the benefit (or detriment) of Sonotec GmbH and/or its owners.

32.     Sonotec GmbH's operations and Sonotec US Inc.'s operations are integrated and interdependent, for example with salespeople employed in the United States working hand-in-glove with engineers employed in Germany to manufacture products specifically tailored to U.S. customers' needs, with Sonotec GmbH retaining

ultimate authority to approve or disapprove a given customization or manufacturing specification.

33.     Sonotec GmbH and Sonotec US Inc. coordinate the control of their workforce, for example with German executives exercising final authority over who is hired to work at Sonotec US Inc.  Upon information and belief, Sonotec GmbH also exercises final control over Sonotec US Inc.'s payroll expenditures.

34.     As of January 2023, many employees of Sonotec U.S. Inc. linked to the page for Sonotec GmbH when indicating their employer on LinkedIn.  In January 2023, the "People" page of Sonotec GmbH's LinkedIn presence indicated more than a dozen employees located in the U.S.

35.     As of January 2023, Sonotec US Inc. did not have an independent presence on LinkedIn.

36.     Executives from Sonotec GmbH are in frequent contact with executives from Sonotec US Inc., coordinating sales, marketing and manufacturing strategies.

37.     Sonotec US Inc. and Sonotec GmbH are a single employer for purposes of Title VII, together employing in excess of 190 employees.

## STATEMENT OF FACTS

### *Sonotec Hires Ms. Adler & Mr. Portelli Begins Targeting Her.*

38.     In January 2022, Tiffany Adler turned 25 years old.

39.     She lived with her mother and two brothers in Suffolk County, New York, and had recently finished coursework for her MBA at Stony Brook University.

40.     Ms. Adler felt optimistic about her future, but she had trouble finding work.

41.    In about July 2022, after months of searching, she applied for a position with Defendant Sonotec US Inc.

42.    Sonotec US Inc. is the American subsidiary of a German company, Defendant Sonotec GmbH (together with Sonotec US Inc., "Sonotec" or "the Sonotec Defendants").

43.    Sonotec is in the business of manufacturing and marketing ultrasonic measurement technology.

44.    According to its website, "SONOTEC develops and manufactures customer-specific ultrasonic transducers, sensors, testing equipment, and measurement technology solutions for Non-Invasive Fluid Monitoring, Preventive Maintenance, and Non-Destructive Testing."

45.    The position Ms. Adler applied for at Sonotec was as a receptionist.  She wanted to do more with her MBA, but she did not want to wait any longer to start earning an income, in part because she wanted to help contribute financially to her mother's household, and she wanted to get her foot in the door in an industry.

46.    After Ms. Adler submitted her application for the receptionist position, Sonotec employees reached out and interviewed her, first over the phone, and then in person at Sonotec US Inc.'s headquarters in Islandia, New York.  The in-person interview ended with a brief meeting with Defendant Christopher Portelli.

47.    Mr. Portelli was then about 42 years old.

48.    Ms. Adler's meeting with Mr. Portelli took place in his office.  The meeting lasted perhaps five or ten minutes, and he asked her no work-related questions.

49.     About one day later, Mr. Portelli telephoned Ms. Adler.  During that phone call, he said that the receptionist position had already been filled.  He said Ms. Adler was overqualified for the role, but he said that he would "find a role" for Ms. Adler at Sonotec.

50.     On July 14, 2022, Sonotec extended an offer to Ms. Adler to be a full-time administrative assistant earning $21 per hour plus benefits.  Ms. Adler understood that the title was temporary while Mr. Portelli created a role for her.  Her first day working was July 25.

51.     Her first week on the job, Mr. Portelli was away on travel, and Ms. Adler was trained by Sonotec employee Angela Stallone.

52.     Ms. Adler's job would be in project management.  She would serve as a liaison between Sonotec's U.S.-based salespeople and its German engineers, to help create and sell custom solutions when Sonotec's off-the-shelf products were not suited for the specific applications needed by U.S. customers.

53.     As Sonotec and Mr. Portelli knew at the time they hired her, Ms. Adler had no experience in project management, had no training in engineering, had no experience in sales, and spoke no German.

54.     However, Ms. Adler was an apt student, and she felt confident that, with more training, she would be able to excel in her role.

55.     Approximately one week after Ms. Adler began her position at Sonotec, Mr. Portelli returned from his trip and took over her training.

56.     But Mr. Portelli provided Ms. Adler with little more training.  He preferred to spend time talking with her about topics unrelated to work, like Star Wars and Star Trek.  Ms. Adler had been assigned a cubicle as her work station, but Mr. Portelli preferred for her to spend most of her day in his office.

57.     Because of her piecemeal training, Ms. Adler remained dependent on her colleagues, and in particular Ms. Stallone and Mr. Portelli, for guidance on how to do her job.

58.     Upon information and belief, Mr. Portelli wanted Ms. Adler to be dependent upon him at work.  Specifically, he wanted Ms. Adler to need his constant help.

59.     Around this time, Mr. Portelli offered to pay for Ms. Adler to have a membership at Orange Theory, a nearby upscale gym.

60.     Ms. Adler felt uncomfortable accepting, but Mr. Portelli told her that he paid for a membership for any Sonotec employee who wanted to go to Orange Theory.

61.     Ms. Adler later found out this was false, and that in fact Mr. Portelli paid for an Orange Theory membership for, at most, one Sonotec employee other than Ms. Adler.

62.     Mr. Portelli would often insist that Ms. Adler come with him to Orange Theory, or would express disappointment and disapproval if she went to Orange Theory alone, or with anyone else other than Mr. Portelli.

63.     Around this time, Mr. Portelli offered Ms. Adler the title of Project Manager. He offered her a salary of $62,000.

64.     Mr. Portelli told Ms. Adler that, in order to formally receive the offer to become Project Manager at the higher salary, she would need to be interviewed by executives from Sonotec GmbH in Germany.

65.     Mr. Portelli said that, before she could interview with the German executives, he wanted to take her to a "business dinner", to "see how she handled herself in a business situation."

### The First Meal at Insignia

66.     On approximately August 2, Mr. Portelli took Ms. Adler to lunch at a steakhouse in Smithtown, New York.

67.     The meal lasted approximately six hours.

68.     Mr. Portelli ordered lavishly, including drinks, sushi, steaks and a bottle of wine that cost hundreds of dollars.

69.     Over the course of the meal, Mr. Portelli told Ms. Adler that he and his wife had an "open relationship."  He told Ms. Adler words to the effect of, "I can do whatever I want."

70.     Mr. Portelli asked Ms. Adler about her boyfriend, and whether they were in an open relationship.  Ms. Adler said they were not.

71.     Mr. Portelli responded with words to the effect of, "You need to live a little," or "You're very reserved, you've got to live a little."

72.     Ms. Adler understood that Mr. Portelli was encouraging her to have sex with people other than her boyfriend.

***Mr. Portelli Coaches Ms. Adler on What To Say to German Management.***

73.    Ms. Adler's interview with the German management took place on about August 3, 2022.

74.    Prior to the interview, Mr. Portelli coached Ms. Adler on what to say.

75.    Mr. Portelli encouraged Ms. Adler to stretch the truth.  For example, he took a copy of Ms. Adler's resume and (without letting her object) edited it for her, exaggerating and even fabricating the depth of her experience as an MBA student at Stony Brook.

76.    Mr. Portelli may or may not have provided the falsified resume to German management.

77.    The interview took place over Zoom.  Manuela Münch and Melanie Schmidt, two representatives of Sonotec GmbH, attended from Germany.  Mr. Portelli and Ms. Adler attended from Islandia, New York.

78.    Mr. Portelli opened up the Zoom session on a computer on his desktop and had Ms. Adler pull up a chair and sit next to him.  After Manuela Münch and Melanie Schmidt finished asking Ms. Adler questions, Ms. Adler was excused and Mr. Portelli continued speaking with the German executives.

79.    After he was done speaking with his German superiors, Mr. Portelli told Ms. Adler, "You have the job."

80.    Mr. Portelli told Ms. Adler that he had told the German executives that she was just an intern.

81.    Upon information and belief, Mr. Portelli had breached internal rules by putting Ms. Adler on Sonotec payroll before he had approval from Sonotec GmbH.

82.    Upon information and belief, Mr. Portelli wanted Ms. Adler to feel complicit in his misrepresentations to executives at Sonotec GmbH, to discourage her from later reporting him to those executives.

83.    Around this time, Mr. Portelli offered to give Ms. Adler $5000 toward the purchase of a new car.  Ms. Adler declined.

84.    Upon information and belief, Mr. Portelli wanted Ms. Adler to own a car she had trouble affording, in order to place her in a position of dependence on him.

***Mr. Portelli frequently introduced inappropriate romantic and sexual matters into conversation with Ms. Adler.***

85.    Mr. Portelli frequently asked to massage Ms. Adler's feet.

86.    Mr. Portelli frequently, and without her consent, would massage Ms. Adler's neck.

87.    Mr. Portelli twice, and without her consent, kissed her on the cheek at work. And once, in Las Vegas, he told her to kiss him on the cheek; Ms. Adler, with distaste, complied.

88.    Mr. Portelli would often regale Ms. Adler with sexual stories.  For example, Mr. Portelli told Ms. Adler that he had had sex with one young, female Sonotec employee.

89.    Mr. Portelli often commented on Ms. Adler's clothes, complimenting her appearance and telling her to wear tighter garments.

90.    Mr. Portelli would stare at Ms. Adler, including when they went to Orange Theory together.  He told her that girls in gym clothes were a turn-on for him, and once remarked, "I'm a sanitary guy, but you know what I'd do to you after class."

91.    Mr. Portelli was explicit about his sexual and romantic desire for Ms. Adler. For example, he told Ms. Adler (in September, in Las Vegas) that "I would love to get married to you," and he told her (in November, in Berlin) that "I can't make it too obvious [here at the trade show] that I'm in love with you."

92.    Mr. Portelli said that he wanted to have children with Ms. Adler.  He remarked that he did not want to have another child with his wife, but he said that if Ms. Adler wanted to have children, he would love to have children with Ms. Adler.

***Mr. Portelli Tried to Ingratiate Himself with Ms. Adler's Family.***

93.    Mr. Portelli attempted to befriend Ms. Adler's boyfriend, including by inviting him to a Knicks game (against the Nets at Barclays Center).

94.    Mr. Portelli attempted to befriend Ms. Adler's mother, including by hiring her, for $100 a week, to clean Sonotec's offices.

***Mr. Portelli presented Ms. Adler with frequent, lavish gifts.***

95.    Mr. Portelli made a habit of presenting Ms. Adler with expensive gifts.

96.    Among the gifts Mr. Portelli gave to Ms. Adler were:

   a.  A Rolex watch.

   b.  A Tudor watch.

   c.  A matching necklace and bracelet from Tiffany.

   d.  A Gucci bag.

e.  A Gucci scarf.

f.  A pair of Gucci shoes.

g.  A Valentino belt.

h.  A pair of Valentino heels.

i.  Three dresses.

j.  A sapphire ring.

97.    Upon information and belief, Mr. Portelli gave these gifts to Ms. Adler both in the hope of winning her romantic and sexual interest, and to make her feel complicit in something improper, in order to ensure her silence.

98.    Ms. Adler did not feel comfortable receiving these gifts, but did not know how to refuse them without risking her job.

99.    If Ms. Adler expressed anything other than enthusiasm about receiving gifts, Mr. Portelli would become hostile.  Ms. Adler learned that it was easier to pretend she wanted the gifts than to refuse them.

100.   For example, Mr. Portelli would pester Ms. Adler about what she wanted him to buy her.  On at least one occasion, when Ms. Adler refused to let Mr. Portelli purchase her anything, he sent her cash via ApplePay without her consent, telling her that he would just keep sending money as long as she refused his offer.  Ms. Adler felt that it was easier, and less risky, to just accept the gift than to fight with her boss.

101.   If Ms. Adler refused to wear the jewelry or clothes that Mr. Portelli gave her when he asked her to, Mr. Portelli would become hostile.

15

***Mr. Portelli constantly requested that Ms. Adler accompany him alone on travel, including repeated excursions unrelated to work.***

102.   Beginning in about September 2022, Mr. Portelli began insisting that Ms. Adler accompany him alone on trips.

103.   In September, Mr. Portelli asked Ms. Adler to accompany him to Bay Area to see client named Outset Medical.

104.   It was on this trip to the Bay Area that he first bought Ms. Adler clothes (a little black dress and a $1200 pair of shoes), remarking, over her objections, words to the effect of, "I would do it for any of the girls if I didn't like what they wore."

105.   Also on this trip to the Bay Area, Mr. Portelli took Ms. Adler to dinner alone at a restaurant called the Plumed Horse.

106.   Mr. Portelli spent $1,258.25 on dinner for the two of them at the Plumed Horse and expensed it to Sonotec.

107.   Over dinner at the Plumed Horse, Mr. Portelli told Ms. Adler "You're beautiful," and "You look like a model."

108.   Over dinner at the Plumed Horse, Mr. Portelli kissed Ms. Adler's hand and tried to hold her hand at the dinner table.  She pulled her hand away.

109.   On their final day in California, Mr. Portelli insisted that they drive to the beach together and smoke marijuana.

110.   Later in September, Mr. Portelli drove Ms. Adler from Long Island to Plattsburgh, New York and back—a trip of about 6 or 7 hours each way.

111.   The purpose of the trip to Plattsburgh was nominally for Ms. Adler to get an expedited Global Entry pass from U.S. Customs.

112.   During the long drives upstate and back, Mr. Portelli told Ms. Adler about his sexual experiences, told her she had "never really lived" due to her lack of sexual experiences and partners, and told her she was "so beautiful."

113.   In about October, Mr. Portelli began insisting that Ms. Adler accompany him on trips with no business purpose.  For example, he took her on a trip to Las Vegas from about October 26 to October 29.

114.   Mr. Portelli told Ms. Adler from the outset that the trip to Las Vegas only for "fun," but made clear that he expected her to accompany him anyway.  He said that he had tried to plan a similar trip to Las Vegas with another young, female employee of Sonotec, but that she had cancelled, out of discomfort at the idea of traveling alone with Mr. Portelli for no business reason.

115.   Mr. Portelli told Ms. Adler that it would make him "so mad" if she cancelled on him.

116.   Ms. Adler did not feel comfortable traveling to Las Vegas alone with Mr. Portelli for no business reason, but she was frightened that, if she declined to go to Las Vegas, Mr. Portelli would take some action against her at work.

117.   Mr. Portelli instructed Ms. Adler to find entertaining things for them to do in Las Vegas.

118.   On the Las Vegas trip, Mr. Portelli booked them a single hotel suite, where they each had separate bedrooms sharing a common living area.  Mr. Portelli remarked that he could have gotten them a nicer hotel if Ms. Adler were willing to sleep in the same room as him.

119.   Mr. Portelli took Ms. Adler shopping in Las Vegas.  He told her to "choose anything" no matter the expense because she "was worth it."  Again, she felt the least risky thing to do was comply.  He bought her the Gucci bag and scarf.  He remarked, "I like dressing you," and "You are the perfect canvas."

120.   Mr. Portelli took her to dinner at a Wolfgang Puck restaurant.  He told her, "I like to make other guys jealous."

121.   One night while they stayed in Las Vegas, Mr. Portelli took Ms. Adler for a drive in a rental car out into the desert and, when he had parked the car in an isolated spot, presented her with the sapphire ring.

122.   As he presented her with the ring, Mr. Portelli told Ms. Adler words to the effect of, "This will always be a part of my heart, if you smash it, you will smash my heart."

123.   On the final night of their trip to Las Vegas, at a Japanese restaurant, Mr. Portelli asked Ms. Adler if she had feelings for him.  Ms. Adler said "No," and Mr. Portelli began crying.

124.   Mr. Portelli said he did not understand why she did not have feelings for him. He pointed out how much money he had spent on her.

125.   Ms. Adler said that she hated his attention ("I hate this situation" were her words), and that she felt guilty all the time,

126.   Mr. Portelli responded with words to the effect of, "Let's not ruin our last night."

127.   Mr. Portelli told her they should forget what happened, and told her that he would not "push her" anymore.

128.   Mr. Portelli then took her to a casino, and then to a rooftop bar at their hotel, purchasing more drinks.  When they retired to the suite, Mr. Portelli told her, "Come lay with me."  Again, she did not know what to do, and so lay down with him on a couch—until he tried to take off her shoes, at which point she fled.

129.   In November, Mr. Portelli took Ms. Adler, alone among Sonotec's U.S.-based employees, on a business trip to Germany.  On this trip, he repeatedly declared his love for her, and became angry when she rejected his appeals.  He took her to a nightclub in Berlin, where he also plied her with alcohol and asked her to dance with him, becoming upset when she would not let him grind on her from behind.

130.   On the last night of this trip to Germany, in Frankfurt, he gave Ms. Adler no real choice but to share a hotel room with him.

131.   Sometime in the autumn, Mr. Portelli told Ms. Adler that he wanted her "dreams to come true," and importuned her to name something special she wanted to do.  Ultimately she said she wanted to go swimming with beluga whales.

132.   Mr. Portelli then booked tickets to SeaWorld in Texas for early December, telling Ms. Adler that they would see clients on the trip, and that swimming with the whales would be a side excursion.

133.   But, in the end, Mr. Portelli did not arrange to meet any clients.  When Ms. Adler learned that there would be no client visits on the trip to Texas—and in

consideration of how disturbed and repulsed she was by what had taken place in Germany—she said that she did not want to go.

134. Mr. Portelli became upset. "Please don't make me waste my money," he said. He pleaded with her to go to Texas, saying they could "just be friends" and that he "understood his place." Ms. Adler felt she had no choice but to consent, because she did not want to lose her job.

135. Mr. Portelli booked them a single room with two beds at a luxury hotel, assuring her, "Nothing will happen."

136. They traveled to Texas together and went to SeaWorld. Ms. Adler was extremely uncomfortable. She put on a good face. But she did not know what she was doing there, and she would rather have been there with anyone else.

137. After the trip to the beluga whales, Mr. Portelli then took Ms. Adler to a dinner where he plied her with alcohol.

138. As they returned to the hotel room after dinner, Mr. Portelli told her to "Look down."

139. Ms. Adler looked down.

140. Mr. Portelli's penis was visibly erect within his pants.

141. Ms. Adler was repulsed.

142. After they got to the room, Mr. Portelli returned downstairs to retrieve his phone, and Ms. Adler got into her bed and pretended to pass out.

143. Mr. Portelli returned to the room, brushed his teeth, and, evidently believing her to be unconscious, got into bed with Ms. Adler.

144.   Mr. Portelli physically moved Ms. Adler's body toward the center of the bed.

145.   Mr. Portelli then lay down behind her.

146.   Mr. Portelli then pressed his erect penis against Ms. Adler's back.

147.   Mr. Portelli then began stroking her hair.

148.   Ms. Adler did not consent to, nor desire, Mr. Portelli lying down beside her.

149.   Ms. Adler did not consent to, nor desire, Mr. Portelli physically moving her body.

150.   Ms. Adler did not consent to, nor desire, Mr. Portelli to press his erect penis against her back.

151.   Ms. Adler did not consent to, nor desire, Mr. Portelli to stroke her hair.

152.   For several minutes, Ms. Adler was frozen in panic.

153.   She did not know what to do.  She was disgusted and terrified and ashamed.

154.   Finally Ms. Adler shouted, "GET OUT OF MY BED!"

155.   Thankfully, Mr. Portelli did get out of her bed.

156.   The next morning, Mr. Portelli asked her if she was angry.  Ms. Adler told him that yes, she was, because she did not consent to him getting into her bed.  Mr. Portelli told her it was her fault for sitting too close to him at the bar.

157.   Later in December, Mr. Portelli told Ms. Adler that he wanted her to take an overnight trip to New York City with him.  He had given her a number of Christmas gifts, and when Ms. Adler resisted the idea of travelling to New York City with him, he said words to the effect of, "All I want for Christmas is going to the city with you, I never ask for anything, I can't believe you won't do this."

158.   Ms. Adler felt she had to agree.

159.   Mr. Portelli insisted that they share a hotel room again, saying, "I won't do anything this time."

160.   On the trip to Manhattan, he insisted they go shopping at Lululemon and Prada.   When Ms. Adler resisted allowing him to purchase anything for her, he became upset, saying, "Don't embarrass me, put your shit up there," meaning next to the register, so he could pay.

***Mr. Portelli reacted harshly to Ms. Adler's refusal to have a romantic or sexual relationship.***

161.   Ms. Adler was not interested in her boss's romantic and sexual attention.

162.   Ms. Adler repeatedly told Mr. Portelli that she did not want his romantic attention and did not want to be his girlfriend.

163.   Ms. Adler tried to reject his attention, including by resisting gifts and resisting travel.

164.   At the same time, Ms. Adler felt shame for not having the strength to more firmly reject Mr. Portelli's romantic and sexual attention.

165.   Ms. Adler felt resigned to Mr. Portelli'a romantic and sexual advances.   And she felt conflicted, too, because she needed the job.   Any given day, she felt it was simpler to play along than to put up a fight.

166.   Ms. Adler did not want to place her job at risk by putting up a fight.

167.   And Ms. Adler soon recognized a pattern.   Every time she rebuffed one of Mr. Portelli's advances, or told him that she did not have feelings toward him, he

would turn nasty.  He would stop speaking to her, stop making eye contact with her, and, most importantly, stop providing her with guidance at work.

168.   Ms. Adler could not do her job as a Project Manager without Mr. Portelli's assistance, but his assistance was only forthcoming if Ms. Adler allowed him to aim his romantic and sexual attention at her.

169.   Mr. Portelli frequently asked Ms. Adler to hold his hand when they were alone together.  She soon understood that, if she just agreed to hold his hand, he would actually help her at work.

170.   At times Mr. Portelli would weep hysterically when Ms. Adler rejected his advances.  In about early November 2022, Mr. Portelli took Ms. Adler on a second trip to Insignia, nominally to have a drink and plan for their upcoming trip to Germany.  But Mr. Portelli then insisted that they have dinner and turned the conversation away from work.  That night, Ms. Adler told him word to the effect of, "You have to stop," and "This isn't right," and "I hate this."  Mr. Portelli wept so violently than mucous ran from his nose, and asked her words to the effect of, "How can you not love me back?"

171.   At times Mr. Portelli even made threats.  On the second-to-last night of their trip to Germany in November, for example, at a hotel in the city of Halle, Mr. Portelli was angry with Ms. Adler for rejecting his advances.  Mr.  Portelli said that he was going to go to his room and take Xanax, saying words to the effect of "I have no purpose" and "I hope I don't overdose."

172.   Ms. Adler understood that Mr. Portelli was threatening to harm himself.

***Mr. Portelli frequently insisted that Ms. Adler drink alcohol with him.***

173.   Mr. Portelli made frequent and transparent efforts to get Ms. Adler drunk. This began on their first trip to Insignia, and continued nearly every time they went to a meal together.

174.   When Ms. Adler told Mr. Portelli that she did not want to drink alcohol, he would order her alcohol anyway—and then continue ordering her drink after drink.

175.   Mr. Portelli told Ms. Adler that he liked how she acted when she was drunk.

176.   Ms. Adler knew that she was less hostile to Mr. Portelli's romantic and sexual advances after several drinks.

***Mr. Portelli showed Ms. Adler pornographic materials, and asked her to show him pornographic materials.***

177.   Mr. Portelli texted Ms. Adler revealing photographs of other women.

178.   Mr. Portelli showed Ms. Adler a video on his own phone of a woman having sex with a man.

179.   Mr. Portelli texted Ms. Adler screen shots that (he said) were texts between a woman and a man; those texts contain lurid descriptions of sexual acts.

180.   Mr. Portelli asked Ms. Adler to show him videos of her and her boyfriend having sex.  She refused.  He said words to the effect, "If I can't have you, I want to watch and be included."  He asked her about what sex positions she enjoyed with her boyfriend.

181.    On one occasion, while on the trip to German in November, Ms. Adler texted her boyfriend a revealing photograph of herself.

182.    Mr. Portelli, upon learning that Ms. Adler was texting her boyfriend, insisted that she show him the texts.  Eventually, Ms. Adler gave in to her boss's instruction.

183.    On one occasion, while on the trip to New York City in December, Mr. Portelli insisted that Ms. Adler come out of the changing room of a store they were visiting to show him an outfit she was trying on.  Ms. Adler did not want to, because the outfit was revealing.  Instead, she decided to take a photograph of herself and show that to her boss.

### *Upon Information And Belief, Mr. Portelli subjected other female employees of Sonotec US to similar sexual harassment.*

184.    Sonotec US Inc. and Sonotec GmbH knew or should have known that Mr. Portelli had sexually harassed women at Sonotec.

185.    Sonotec US Inc. and Sonotec GmbH knew or should have known that Mr. Portelli had the propensity to continue sexually harassing women at Sonotec.

186.    Mr. Portelli boasted to Ms. Adler that he had had sex with one young, female subordinate at Sonotec.

187.    A second young, female subordinate of Mr. Portelli told Ms. Adler that she, too, had been subjected to harassment by Mr. Portelli, texting Ms. Adler (with respect to what she had witnessed Mr. Portelli doing to Ms. Adler), "He's FICKING [sic] harassing you," and texting, "It's been mentally draining me.  From me going through it.  And now you going through it and I'm being involved."

188.   Upon information and belief, Christy Baldwin, who had responsibility for all HR functions at Sonotec US Inc., knew that Mr. Portelli had had sex with a young, female subordinate at Sonotec.

189.   Upon information and belief, Christy Baldwin, Angela Stallone and others knew that Mr. Portelli was traveling alone with young, female subordinates for no business purpose.

190.   Upon information and belief, Christy Baldwin, Angela Stallone and others knew that Mr. Portelli was expensing to Sonotec the cost of traveling alone with young, female subordinates for no business purpose, including meals, lodging, airfare and carfare.

191.   Neither Sonotec US Inc. nor Sonotec GmbH had confidential and impartial systems in place to prevent or remedy sexual harassment by the Managing Director of Sonotec US Inc.  For example, there was no individual in the United States who could act independently of Mr. Portelli to receive or investigate complaints about his conduct.

***Mr. Portelli Publicly Gropes Ms. Adler At The Company Christmas Party***

192.   At a company Christmas party at Insignia on December 22, 2022, Mr. Portelli insisted on sitting next to Ms. Adler.

193.   While sitting next to her at the Christmas party, Mr. Portelli repeatedly placed his hand on Ms. Adler's thigh and on her arm.

194.   His touching of her arm was a display of control, to pull her to him or keep her with him.

195.   His touching of her thigh was sexual in nature.

196.   Ms. Adler did not consent to, nor desire, Mr. Portelli touching her arm.

197.   Ms. Adler did not consent to, nor desire, Mr. Portelli touching her leg.

198.   Other co-workers saw that Ms. Adler was visibly uncomfortable sitting next to Mr. Portelli.

199.   Upon information and belief, female employees texted Mr. Portelli to stop touching Ms. Adler.

200.   Several female employees spoke with Ms. Adler in the women's restroom, and told her that they had seen her "giving us eyes"—meaning that they saw her mutely pleading for help.

201.   In the car on the way home from the Christmas party that night, Ms. Adler had a panic attack caused by Mr. Portelli's aggressive, sexual and nonconsensual conduct.

202.   On the morning of December 23, over the telephone, Ms. Adler told Mr. Portelli unequivocally that his behavior was unacceptable.  She told him that she did not want to travel alone with him on a planned trip to California.

### *Mr. Portelli Realizes He Has Gone Too Far*

203.   Mr. Portelli realized that he had gone too far by fondling Ms. Adler in front of her co-workers.

204.   Mr. Portelli texted Ms. Adler repeatedly over the Christmas holidays, attempting to smooth things over.

205.   In one remarkable series of texts sent over Christmas Eve and Christmas Day, Mr. Portelli texted Ms. Adler, pretending to be his wife.  Upon information and belief, Mr. Portelli gained access to his wife's text message account and, from that account, texted messages to Ms. Adler.

206.   In the text messages in which Mr. Portelli impersonated his wife, he wrote to Ms. Adler, *inter alia*:

  a. "I know you make him very happy.  He adores you and I even feared a little enough to leave me."

  b. "I caught him in the shower crying after going to orange theory and finding out you might not go with him anymore."

  c. "You guys can do what ever makes you happy as long as I know he comes home, but right now I see I have lost my husband."

207.   On December 27th, Ms. Adler and Mr. Portelli were both in the office and had a series of three meetings.

208.   The first meeting on December 27 was to review Ms. Adler's performance.  It was attended by Mr. Portelli, Ms. Stallone and Ms. Adler.  Ms. Adler received a positive review.

209.   The second meeting on December 27 lasted about 90 minutes.  It was attended by Mr. Portelli and Ms. Adler.  In this meeting, they discussed their personal relationship.

210.   Ms. Adler made a recording of that 90-minute meeting on her phone.

211.   During the 90-minute meeting on December 27 between Ms. Adler and Mr. Portelli, Mr. Portelli stated to Ms. Adler:

    a.   "You're the best thing that ever came into my life."

    b.   "You're the only person that I've ever felt anything like this with."

    c.   "I really did love you, I care about you."

    d.   "I gambled 17 people's employment on you and literally, I've always told you that you can destroy me and you can. If you want to contact Germany, go for it. It will hurt, can't fire me, that they can't do. They can ask me to resign, and they'll have to buy me out and then they close up shop. Like that is the reality. You know that that is, if you see that employment contract that is what will happen. I don't want that."

    e.   "Like I will literally do whatever you want me to do. I don't want to lose you as an employee, I think you'll be really successful. And I really meant everything I said, by the way, because I saw you as a good business partner. But, I think at least as a Project Manager and helping out with sales from the inside. I'll handle the outside, you know, maybe I'll take like…I'll see if, ah ….we'll figure it out. We'll get someone else to help out, it's no big deal. Umm…except for you know, the big trade shows, we'll all be together. You were literally the best thing that came into my life."

    f.   "I lost my mind over the holidays, talk about depressive times, and I tried everything to make sure that at least my kids would have a good

holiday. I, it's not your fault, I lost my mind because of my own actions, what I did to you, how I made you feel. I never ever ever tell you to feel bad. I really did love you. I will always care about you, and I always want to protect you."

g. "I feel like the biggest piece of shit in this fucking world. I, for doing it in front of all the employees and obviously making it obvious enough and making you feel like shit, I don't want to even look at anybody anymore. Like, like, look at anybody, like, you know what I mean? I am so ashamed of myself. I am so ashamed. I feel like a pathetic, pathetic old guy. But, I really do care about you."

h. "Shit's already fucking bad. Do I want to lose my company? Probably not. Let me know and I'll just friggin' tell them I want to sell the company and I want to resign before you friggin' destroy my whole career and I won't be able to get a job easily. Not your problem, but umm…yeah….I will not make this a hostile place for you. You have…I'll make this a normal place for you that you like to be at."

i. "No, that's not why I hired you. You think I would have hired you cause you were a piece of ass, you know how much cheaper it would be to just go get escort?  And a lot less complicated. That's not why I hired you. I heard you were smart with an MBA. And you dressed really well. I actually gave a shit at your interview. And also because Christie said that I should…and that you were really good. No, I didn't hire you

because of, like, looks. I didn't become attracted to you for friggin' months."

212.   During the 90-minute meeting on December 27 between Ms. Adler and Mr. Portelli, Mr. Portelli did not dispute that he had known all along that Ms. Adler did not want his romantic or sexual attention:

    a.   Mr. Portelli stated:  "I'm asking you to forgive me because I actually really, really do care about you and deep down, I fucking really care."

    b.   Ms. Adler replied: "If you really cared, you would have stopped when I asked you in the beginning."

    c.   Mr. Portelli stated:  "I'm so sorry because I just…"

    d.   Ms. Adler replied: "When I asked you to make Germany just a work trip, I just want to focus on work, you got so mean and you got so nasty. That was the worst…that was the worst week of my fucking life. You made it miserable."

213.   During the 90-minute meeting on December 27 between Ms. Adler and Mr. Portelli, Mr. Portelli admitted that he forcibly touched Ms. Adler without her consent:

    a.   Mr. Portelli stated:  "I unconsciously wanted to hold [your] hand and instead I touched [your] leg and made [you] feel really uncomfortable."

    b.   Ms. Adler replied:  "It wasn't one time, you were touching me like the whole night."

    c.   Mr. Portelli replied:  "I know.  I...  I'm just saying…"

d.  Ms. Adler replied:  "And just touching my arms. And keep asking why I'm moving away from you."

214.   The third meeting on December 27 was to discuss Ms. Adler's compensation going forward.  This meeting was attended by Mr. Portelli and Ms. Adler.  Mr. Portelli offered Ms. Adler a raise to $67,000 per year with a guaranteed $3000 bonus to be paid in January 2023.

215.   Also on December 27, after the 90-minute phone call, Mr. Portelli gave Ms, Adler the Rolex mentioned above, saying words to the effect of, "I was going to give this to you for your birthday."  Ms. Adler remarked that the Rolex was too much money and she did not want it, but Mr. Portelli insisted that she take it.  At the time, Ms. Adler suspected that Mr. Portelli gave her the watch as an apology for what he did at the Christmas party, or to keep her quiet.

216.   On December 28, 2022, Mr. Portelli called Ms. Adler on the phone.

217.   During the December 28, 2022 phone call, Mr. Portelli asked Ms. Adler if they could be "casual friends."  Ms. Adler said no.

218.   Upon information and belief, on or about December 28, 2022, Mr. Portelli realized that Ms. Adler would never be sexually or romantically available to him.

219.   Upon information and belief, on or about December 28, 2022, Mr. Portelli realized that Ms. Adler would no longer submit to his sexual or romantic advances toward her.

220.   In the following days, Ms. Adler considered her options.

221.   Ms. Alder discussed retaining legal counsel with a co-worker.

222.    Ms. Adler researched her legal options on devices owned by Sonotec, including searching for information on sexual harassment lawsuits and visiting the website of the undersigned law firm on January 3, 2023.

223.    Upon information and belief, whether through communications with a Sonotec employee or through a review of the browsing and telephone history on Sonotec devices, on or about January 3, 2023, Mr. Portelli learned that Ms. Adler was seeking legal advice with respect to sexual harassment.

***Defendants Terminate Ms. Adler.***

224.    On January 5, 2023, Mr. Portelli called Ms. Adler to inform her that she was now terminated.

225.    Mr. Portelli fired Ms. Adler's mother the same day he fired Ms. Adler.

226.    As a condition of her employment, Ms. Adler had been expected to tolerate near daily pressure to enter into a sexual or romantic relationship with Mr. Portelli; was subject to frequent remarks about her appearance; was subject to frequent and highly sexual comments and questions; was subject to staring, hand-holding, hugging, massaging and other unwanted physical contact with Mr. Portelli; and she was expected to make frequent trips alone with Mr. Portelli, during which she was expected to let Mr. Portelli conduct himself like her lover.

227.    Defendants fired Ms. Adler on January 5, 2023 because, in late December 2022 she had unequivocally refused Mr. Portelli's continued romantic and sexual advances.

228.    Defendants fired Ms. Adler on January 5, 2023 because she had sought to obtain legal advice with respect to her rights under Title VII and NYSHRL, including her rights with respect to sexual harassment.

***Ms. Adler has been profoundly impacted by Defendants' conduct.***

229.    During her employment, and as a direct result of her treatment by Mr. Portelli, Ms. Adler was diagnosed with anxiety and depression.

230.    One side-effect of her depression was that Ms. Adler was unable to safely treat the frequent headaches she suffered at work.  She suffered through hours of physical pain as a result.

231.    During her employment, and as a direct result of her treatment by Mr. Portelli, Ms. Adler felt, by turns, shame, fear and disgust.

232.    During her employment, and as a direct result of her treatment by Mr. Portelli, Ms. Adler has been unable to openly discuss her experiences and emotions with her family or her boyfriend, causing further distress.

233.    The night of the Christmas party, after Mr. Portelli forcibly touched her in public and against her will, Ms. Adler had a panic attack, causing her both physical discomfort and mental distress.

234.    During her employment, and as a direct result of her treatment by Mr. Portelli, Ms. Adler has suffered nightmares so severe that they woke her boyfriend up at night.

235.    Ms. Adler has suffered other physical and psychological harms, directly stemming from the trauma of her treatment by Defendants.

## COUNT I
### Hostile Work Environment and Quid Pro Quo Sexual Harassment, and Retaliation, in Violation of Title VII
#### *Defendants Sonotec US Inc. and Sonotec GmbH*

236.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

237.   For purposes of Title VII, Sonotec US Inc. and Sonotec GmbH (together, "Sonotec") are a single employer employing in excess of 190 employees.

238.   Sonotec employed Plaintiff from approximately July 2022 to approximately January 5, 2023.

239.   Plaintiff's immediate supervisor at Sonotec was Managing Director Christopher Portelli.

240.   Plaintiff's work environment was permeated with discrimination and intimidation directed at her by Mr. Portelli because she was a woman.

241.   Mr. Portelli subjected Plaintiff to constant sexual and romantic overtures and coercion, including without limitation demands to travel alone with Plaintiff for no work-related reason, explicitly romantic and sexual communications, comments and inquiries about Plaintiff's appearance and about her sexual and romantic life, constant requests for a sexual and romantic relationship, and unwanted romantic and sexual touching.

242.   Mr. Portelli directed his sexual and romantic overtures and coercion toward Plaintiff because she was a woman.

243.   Plaintiff did not want Mr. Portelli's constant sexual and romantic overtures and coercion.

244.   Plaintiff objected to Mr. Portelli's constant sexual and romantic overtures and coercion.

245.   Mr. Portelli's sexual and romantic overtures and coercion occurred nearly daily; involved the repeated threat of unwanted physical contact; were humiliating to Plaintiff; and unreasonably interfered with Plaintiff's job performance.

246.   Mr. Portelli's sexual and romantic overtures and coercion were severe and pervasive enough to alter the conditions of Plaintiff's employment at Sonotec.

247.   Simply put, if she wanted to work at Sonotec, Plaintiff had to let Mr. Portelli travel alone with her, give her gifts, talk about romance and sex with her, pressure her for romantic affection and sex, and engage in romantic and sexual touching.

248.   On or about December 27 and December 28, 2022, Mr. Portelli finally came to understand that Plaintiff was refusing to have any sexual or romantic relationship with him.

249.   In or about late December 2022 or early January 2023, Mr. Portelli learned that Plaintiff was seeking to obtain legal advice concerning sexual harassment, including her rights under Title VII.

250.   On or about January 5, 2023, Mr. Portelli, acting on Sonotec's behalf, terminated Plaintiff.

251.   Sonotec terminated Plaintiff because Mr. Portelli had finally come to understand that Plaintiff was refusing to have any sexual or romantic relationship with him.

252.   Sonotec terminated Plaintiff because Mr. Portelli learned that Plaintiff was seeking to obtain legal advice concerning sexual harassment, including her rights under Title VII.

253.   Plaintiff was harmed by Sonotec's conduct as alleged in this Complaint.

254.   Plaintiff is entitled to damages, including compensatory damages for her economic losses, including without limitation lost back wages, lost front wages, lost benefits, and damage to Plaintiff's professional reputation; compensatory damages for her non-economic losses, including without limitation the emotional, psychological and physical distress, pain and suffering detailed above; punitive damages; pre- and post-judgment interest; and the costs of this suit and reasonable attorney's fees.

### COUNT II
**Hostile Work Environment and Quid Pro Quo Sexual Harassment, and Retaliation, in Violation of NYSHRL**
*All Defendants*

255.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

256.   Sonotec US Inc. and Sonotec GmbH (together, "Sonotec") employed Plaintiff from approximately July 2022 to approximately January 5, 2023.

257.   Plaintiff's immediate supervisor at Sonotec was Managing Director Christopher Portelli (together with Sonotec, "Defendants").

258.   Mr. Portelli had an ownership interest in Sonotec, including owning a stake in Sonotec US Inc., and authority (albeit sometimes limited) to hire and fire employees.

259.   Plaintiff's work environment was permeated with discrimination and intimidation directed at her by Mr. Portelli because she was a woman.

260.   Mr. Portelli subjected Plaintiff to constant sexual and romantic overtures and coercion, including without limitation demands to travel alone with Plaintiff for no work-related reason, explicitly romantic and sexual communications, comments and inquiries about Plaintiff's appearance and about her sexual and romantic life, constant requests for a sexual and romantic relationship, and unwanted romantic and sexual touching.

261.   Mr. Portelli directed his sexual and romantic overtures and coercion toward Plaintiff because she was a woman.

262.   Plaintiff did not want Mr. Portelli's constant sexual and romantic overtures and coercion.

263.   Plaintiff objected to Mr. Portelli's constant sexual and romantic overtures and coercion.

264.   Mr. Portelli's sexual and romantic overtures and coercion occurred nearly daily; involved the repeated threat of unwanted physical contact; were humiliating to Plaintiff; and unreasonably interfered with Plaintiff's job performance.

265.   Mr. Portelli's sexual and romantic overtures and coercion were severe and pervasive enough to alter the conditions of Plaintiff's employment at Sonotec.

266.   Simply put, if she wanted to work for Defendants, Plaintiff had to let Mr. Portelli travel alone with her, give her gifts, talk about romance and sex with her,

pressure her for romantic affection and sex, and engage in romantic and sexual touching.

267.   On or about December 27 and December 28, 2022, Mr. Portelli finally came to understand that Plaintiff was refusing to have any sexual or romantic relationship with him.

268.   In or about late December 2022 or early January 2023, Mr. Portelli learned that Plaintiff was seeking to obtain legal advice concerning sexual harassment, including her rights under NYSHRL.

269.   On or about January 5, 2023, Defendants terminated Plaintiff.

270.   Defendants terminated Plaintiff because Defendants had finally come to understand that Plaintiff was refusing to have any sexual or romantic relationship with Mr. Portelli.

271.   Defendants terminated Plaintiff because Defendants learned that Plaintiff was seeking to obtain legal advice concerning sexual harassment, including her rights under NYSHRL.

272.   Sonotec GmbH and Sonotec US Inc., both individually and collectively, condoned and approved the conduct that Christopher Portelli undertook with respect to Plaintiff, including without limitation her termination.

273.   Defendants' conduct was willfully and wantonly negligent and/or reckless, and Defendants acted, and/or failed to act, with a conscious disregard for the rights of Plaintiff, or with recklessness as to the amount of damage that Plaintiff might suffer.

274.   Plaintiff was harmed by Defendants' conduct as alleged in this Complaint.

275.   Plaintiff is entitled to damages, including compensatory damages for her economic losses, including without limitation lost back wages, lost front wages, lost benefits, and damage to Plaintiff's professional reputation; compensatory damages for her non-economic losses, including without limitation the emotional, psychological and physical distress, pain and suffering detailed above; punitive damages; pre- and post-judgment interest; and the costs of this suit including reasonable attorney's fees.

### COUNT III
### Negligent Supervision
### *Defendants Sonotec US Inc. and Sonotec GmbH*

276.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

277.   At all times relevant to this Complaint, Defendants Sonotec US Inc. and Sonotec GmbH (together, "Sonotec") had actual and/or constructive knowledge of Christopher Portelli's history of, and propensity for, inappropriate conduct, including sexual harassment, directed toward young female employees in the workplace.

278.   Sonotec placed Christopher Portelli in a position to cause harm to young female employees in the workplace.  For example, and without limitation, Sonotec permitted Christopher Portelli to continue as the Managing Director of Sonotec US Inc. and to travel unaccompanied with young female employees, even after Sonotec had actual and/or constructive knowledge of Christopher Portelli's history of, and propensity for, inappropriate conduct, including sexual harassment, directed toward young female employees of Sonotec in the workplace and during travel.

279. Sonotec permitted Mr. Portelli's inappropriate conduct toward young female employees at Sonotec to fester unchecked for years.

280. It was foreseeable that Christopher Portelli would continue to engage in inappropriate conduct directed toward female employees of Sonotec in the workplace and during travel, including sexual harassment.

281. Sonotec could have protected Plaintiff from sexual harassment by Christopher Portelli if it had implemented reasonable supervision of Mr. Portelli, including, without limitation, by creating a supervisory HR apparatus for reporting misconduct and administering discipline that could operate independently of Mr. Portelli, and by supervising Mr. Portelli's expenses and travel.

282. Sonotec did not protect Plaintiff from sexual harassment by Christopher Portelli.

283. In failing to protect Plaintiff and other young women from sexual harassment by Christopher Portelli, Sonotec was grossly negligent.

284. In failing to protect Plaintiff and other women from sexual harassment by Christopher Portelli, Sonotec was willfully and wantonly negligent and/or reckless, and acted, and/or failed to act, with a conscious disregard for the rights of Plaintiff and other women, or with recklessness as to the amount of damage that Plaintiff and other women might suffer.

285. Plaintiff is entitled to damages, including for her pain, suffering, emotional distress, mental anguish and humiliation resulting from Sonotec's failure to supervise Mr. Portelli.

## COUNT IV
### Battery
### *Defendant Christopher Portelli*

286.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

287.   Defendant Christopher Portelli repeatedly made bodily contact with Plaintiff.

288.   The bodily contact was offensive in nature.  For example, and without limitation, on one occasion Mr. Portelli pressed his erect penis against Plaintiff, and on one occasion Mr. Portelli placed his hand on Plaintiff's thigh.

289.   The bodily contact was intentional.  For example, and without limitation, Mr. Portelli intended to press his erect penis against Plaintiff and intended to place his hands on Plaintiff's thigh.

290.   The bodily contact was willful and wanton and made with a conscious disregard for Plaintiff's rights.  For example, and without limitation, Mr. Portelli knew that Plaintiff did not consent to any sexual contact with him, yet Mr. Portelli persisted in physical, sexual contact with Plaintiff.

291.   Plaintiff was harmed by these instances of offensive physical conduct, including, without limitation, suffering severe psychological trauma.

292.   Plaintiff is entitled to damages, including for her pain, suffering, emotional distress, mental anguish and humiliation resulting from the battery, and an award of punitive damages.

## COUNT V
## Assault
### *Defendant Christopher Portelli*

293.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

294.   Defendant Christopher Portelli repeatedly and intentionally engaged in physical conduct that placed Plaintiff in imminent apprehension of harmful contact.

295.   For example, and without limitation, Mr. Portelli pressed his erect penis against Plaintiff, placing Plaintiff imminent apprehension that Mr. Portelli would touch her further.

296.   For example, and without limitation, Mr. Portelli placed his hands on Plaintiff's thigh, placing Plaintiff in imminent apprehension that Mr. Portelli would touch her further.

297.   Mr. Portelli acted willfully and wantonly and with a conscious disregard for Plaintiff's rights.   For example, and without limitation, Mr. Portelli knew that Plaintiff did not consent to any sexual contact with him, yet Mr. Portelli persisted in pursuing physical, sexual contact with Plaintiff.

298.   Plaintiff was harmed by these instances of threatened offensive physical conduct, including, without limitation, suffering severe psychological trauma.

299.   Plaintiff is entitled to damages, including for her pain, suffering, emotional distress, mental anguish and humiliation resulting from the battery, and an award of punitive damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. An award of compensatory damages for Plaintiff's economic losses, including lost back wages, lost front wages, lost benefits, and damage to Plaintiff's professional reputation;

b. An award of compensatory damages for Plaintiff's non-economic losses, including without limitation the emotional, psychological and physical distress, pain and suffering detailed above;

c. An award of punitive damages;

d. An award of pre-judgment and post-judgment interest;

e. An award of the costs of this suit and reasonable attorney's fees, as provided by Title VII and the NYSHRL; and

f. Such other and further relief as to this Court appears necessary and proper.


//

//

//

//

//

//

## JURY DEMAND

Plaintiff Tiffany Adler demands a trial by jury on all issues so triable.


Dated:     New York, New York
           March 1, 2023

                                    Respectfully Submitted,
                                    GRANOVSKY & SUNDARESH PLLC

                                    _____
                                    Benjamin Rudolph Delson (BD-1724)
                                    Alexander Granovsky (AG-6962)
                                    48 Wall Street / New York, NY 10005
                                    delson@g-s-law.com
                                    ag@g-s-law.com
                                    (646) 524-6001
                                    *Attorneys for Plaintiff Tiffany Adler*